# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 3915 | **DATE** | 3/27/2002 |
| **CASE TITLE** | Bixby's Food Systems, Inc. vs. Jan and Phillip McKay | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 4/25/2002 at 10:30 A.M.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Counterplaintiffs' Motion for Summary Judgment against Counterdefendant Ken Miyamoto is granted as to Count I and Count IV, and denied as to Count II and Count V. Miyamoto is directed to contact the Courtroom Deputy at (312) 435-5833 to provide a telephone number where he can be reached if he wishes to participate in the April 25, 2002 status hearing by telephone.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

3
number of notices

MAR 2 8 2002
date docketed

UMJ
docketing deputy initials

Document Number

179

courtroom deputy's initials

U.S. DISTRICT COURT

02 MAR 27 PM 4: 11

Date/time received in central Clerk's Office

date mailed notice

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| BIXBY'S FOOD SYSTEMS, INC. | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| JAN AND PHILLIP McKAY, | ) ) | **Case No. 96 C 3915** |
| Defendants. | ) ) | **Magistrate Judge Nan R. Nolan** |
| JAN AND PHILLIP McKAY, | ) ) ) | |
| Counterplaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| BIXBY'S FOOD SYSTEMS, INC., KEN MIYAMOTO, MIKE STOPULOS, MARY FRAN STOPULOS, ALLEN FREED, LEE STAAK and JEFF SCHUETT | ) ) ) ) ) ) | |
| Counterdefendants. | ) | |

DOCKETED

MAR 28 2002

## MEMORANDUM OPINION AND ORDER

This is an action originally brought by Bixby's Food Systems, Inc. ("Bixby's) against Defendants Jan and Phillip McKay ("McKays") under the Lanham Act. This matter is before the Court on Counterplaintiffs McKays' Motion for Summary Judgment against Counterdefendant Ken Miyamoto on their counterclaims under the Illinois Franchise Disclosure Act (Count I), the Minnesota Franchise Act (Count II), the Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV), and of common law fraud (Count V). The parties have consented to the jurisdiction

of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons below, the Counterplaintiffs' motion is GRANTED in part and DENIED in part.

## I.  **PROCEDURAL HISTORY**

This case began as a claim for trademark infringement brought by Bixby's against the McKays for their alleged violation of a franchise agreement. The McKays brought counterclaims against Bixby's and four individuals associated with Bixby's, alleging various state law claims and claims under the Racketeer Influenced and Corrupt Organizations Act.

The McKays voluntarily dismissed their claims against counterdefendants Lee Staak and Jeff Schuett in May and July 1997. Magistrate Judge Bobrick then dismissed some of the McKays' claims pursuant to motions brought by the remaining counterdefendants. *Bixby's Food Sys., Inc. v. McKay*, 985 F. Supp. 802 (N.D. Ill. 1997). The McKays' claims against counterdefendants Allen Freed and Mike and Mary Fran Stopulos were dismissed in 1999 pursuant to two separate settlement agreements. In October 1999, an order of default judgment was entered against Bixby's, the corporate counterdefendant, in the amount of $587,900.00.

Ken Miyamoto, appearing pro se,[1] is the only remaining counterdefendant. The claims pending against him are under the Illinois Franchise Disclosure Act (Count I); the Minnesota Franchise Act (Count II); and the Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV); and for common law fraud (Count V). Presently before the Court is the McKays' motion for summary judgment on all counts against Miyamoto.

---

[1]District courts are required to construe a pro se litigant's pleadings liberally, in order to ensure that they are given "'fair and meaningful consideration.'" *Pearson v. Gatto*, 933 F.2d 521, 527 (7th Cir. 1991) (citations omitted).

## II.   UNCONTESTED FACTS

The following uncontested facts are relevant to the claims and arguments made in the present motion.[2]  Bixby's was a franchisor of bagel restaurants.  (St. Facts ¶1.)  Counterdefendant Ken Miyamoto was Bixby's President and a Director of the company.  At some point in the fall of 1994, the McKays became interested in investing in a business and eventually decided upon opening a restaurant franchise.  (*Id.* ¶¶6-7.)  Before that time, Phillip McKay had a dental practice, and Jan McKay worked for Ameritech.  (*Id.* ¶6.)

The McKays became acquainted with the Bixby's franchise through a friend who had signed a development agreement[3] to open Bixby's franchises.  (*Id.* ¶3-5.)  Through the friend, the McKays met Miyamoto on October 19, 1994.  (*Id.* ¶7-8.)  That day, the McKays received a Franchise Offering Circular with an effective date of September 6, 1994 ("FOC No. 1").  (*Id.* ¶9.)  FOC No. 1 stated that "[t]he initial investment for a franchise, inclusive of initial franchise fee, is expected to be between $143,000 and $198,000."  (Counterpl.'s Ex. A-1 at 1.)  The projected annual earnings of a franchise were expected to be $139,450 and based upon projected annual sales of $625,000 and

---

[2]The recitation of facts reflects the relevant portions of the McKays' Local Rule 56.1 Statement of Uncontested Facts that are supported by their Requests to Admit, which this Court previously found that Miyamoto had admitted by default.  *See Bixby's Food Systems, Inc. v. McKay*, No. 96 C 3915, 2001 WL 477156 (N.D. Ill. May 3, 2001).  Miyamoto's submissions in response to the motion for summary judgment include affidavits and belated answers to the Requests to Admit that contradict the earlier admissions.  Any of his submissions that are inconsistent with facts already deemed admitted are stricken and will not be considered in ruling on the present motion.  *See Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1056-57, 1959 (7th Cir. 2000); *Rick v. Toyota Indus. Equip. Co.*, No. 93 C 1331, 1994 WL 484633, at *5 (N.D. Ill. Sept. 2, 1994).

[3]A development agreement gave the prospective franchisee the right to purchase a certain number of franchises within a given geographic area.  (Counterpl.'s Ex. A-3, at IL1.)

3

a number of other assumptions, including that the space leased would be between 1,400 and 2,200 square feet. (*Id.* at IL29-IL32.)

The McKays and Miyamoto continued to have discussions after their initial meeting, and Miyamoto repeated to the McKays the investment and annual earnings figures reflected in FOC No. 1. (St. Facts ¶12.) Miyamoto further stated to the McKays that FOC No. 1's figures were conservative, that "existing bagel stores were doing annual sales in excess of $1,000,000.00, and that Bixby's franchises would exceed these revenue figures." (*Id.*)

At some point in November or December 1994, the McKays tendered to Miyamoto a check dated December 16, 1994 in the amount of $15,000, for the purpose of securing a development agreement. On December 15, 1994, the McKays executed a development agreement, which gave them the right to purchase a Bixby's franchise in Kane County, Crystal Lake, Algonquin, and Lake in the Hills, Illinois. (*Id.* ¶15-16.) After signing the development agreement, the McKays, along with representatives of Bixby's including Miyamoto, began investigating several locations where they could open up their Bixby's franchise.

Eventually the McKays looked at a 2,000 square foot space for lease in Geneva, Illinois, which is located in Kane County. (*Id.* ¶17-18.) Miyamoto indicated to the McKays that they "might be interested" in leasing an additional adjacent space, which would equal a total of more than 3,000 square feet. (*Id.* ¶19.) The McKays were not comfortable with leasing the larger space, and their real estate broker "expressed serious concerns" about it. Miyamoto, however, "insisted on leasing the two spaces," "urged the McKays to lease the larger space," and "assured the McKays that leasing the larger space was in their best interests and that the site would bring in annual revenues in excess

4

of $1,000,000.00." (*Id.* ¶¶20-21.) No other Bixby's restaurant nationwide was as large as 3,000 square feet. (*Id.* ¶21.)

On April 11, 1995, the McKays attended a reception held by Bixby's for existing and prospective Bixby's franchisees. (*Id.* ¶22.) Miyamoto spoke at the meeting and stated that prospective franchisees had signed and paid for 340 development agreements; at the time, however, no more than fifteen development agreements had been executed and paid for. (*Id.* ¶24.) In May 1995, Miyamoto was quoted in a company newsletter as stating that Bixby's had 340 signed and paid-for development agreements, which represented "a $68 million vote of confidence." (Counterpl.'s Ex. A-7.)

At the April 11 meeting, the McKays received a second Franchise Offering Circular, with an effective date of March 31, 1995 ("FOC No. 2"). (St. Facts ¶25.) One week later, on April 18, 1995, Miyamoto drove to the McKays' home and gave them a franchise agreement for the proposed Geneva site. (*Id.* ¶¶26, 28.) Neither of the McKays had reviewed FOC No. 2 before executing the franchise agreement. (*Id.* ¶27.) Both of the McKays signed the agreement on April 18, 1995. (*Id.* ¶¶29-30.) Miyamoto backdated the franchise agreement in two separate locations to March 24, 1995 and March 31, 1995; after the McKays questioned Miyamoto about the backdating, Miyamoto told them that it was only a "minor technical matter" and that it would save them money. (*Id.* ¶31-32.)

In May 1995, the McKays executed a lease for the approximately 3,000 square foot space in Geneva, Illinois and proceeded with the build-out of the property. (*Id.* ¶35-38.) The McKays' initial investment including the purchase and build-out was in excess of $400,000, which is more than the estimated investment of between $143,000 and $198,000 in FOC No. 1 and the estimate of between

5

$236,000 and $354,000 in FOC No. 2. (*Id.* ¶39.) The McKays expressed their concerns about the discrepancies between their actual investment and the estimates contained in FOC No. 1, but Miyamoto assured them that FOC No. 1 was accurate, their costs were normal, and that their sales would cover their costs. (*Id.* ¶40-41.) At the time Miyamoto told the McKays that the figures in FOC No. 1 were accurate, he knew them to be false. (*Id.* ¶42.)

After opening their store, the McKays continued to experience investment costs greater than those estimated in FOC No. 1. Their sales levels ranged from $25,000 to $30,000 per month. (*Id.* ¶47.) After operating for about eight months, Bixby's terminated the McKays' franchise agreement due to their inability to pay Bixby's franchise royalty fees. (*Id.* ¶49.)

## III.    DISCUSSION

### A.    Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of proving that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.*

In its motion, the McKays have the burden of directing the Court "to the determinative issues and the available evidence that pertains to each." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). In a case like the present one, in which the movant will bear the burden of persuasion at trial, the

movant "must support its motion with credible evidence – using any of the materials specified in Rule 56(c) – that would entitle it to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331.

In deciding on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In response to "a properly supported motion for summary judgment," the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted). The non-movant, however, "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Selan*, 969 F.2d at 564 (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A party may not avoid summary judgment merely by promising to produce admissible evidence at trial. *See Rick v. Toyota Indus. Equip. Co.*, No. 93 C 1331, 1994 WL 484633, at *5 (N.D. Ill. Sept. 2, 1994).

Summary judgment may properly be granted on the basis of a party's default admissions, e.g., for failing to respond to requests to admit or to a Local Rule 56.1 statement. *United States v. Kasoboski*, 834 F.2d 1345, 1350 (7th Cir. 1987); *Rick*, 1994 WL 484633, at *5; *Hill v. Human Rights Comm'n*, 762 F. Supp. 196, 198 (N.D. Ill. 1991). However, a party's default admissions do not automatically result in summary judgment for his opponent. "To warrant summary judgment, the district court must make the further finding that given the undisputed facts, summary judgment is proper as a matter of law. . . . 'Where the evidentiary matter in support of the motion [for summary judgment] does not establish the absence of a genuine issue, summary judgment must be denied *even if no opposing evidentiary matter is presented*.'" *Wienco, Inc. v. Katahn Assocs., Inc.*, 965 F.2d 565,

568 (7th Cir. 1992) (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)) (citation omitted) (emphasis in original).

In ruling on a summary judgment motion, the judge must not weigh the evidence presented but must only determine whether there exists an issue of material fact for trial. *See Anderson*, 477 U.S. at 249. The Court is obligated, however, to view the evidence presented "through the prism of the substantive evidentiary burden." *Id.* at 254.

## B.    Illinois Franchise Disclosure Act

In Count I of their counterclaim, the McKays allege that Miyamoto violated sections 5, 6, 11, and 26 of the Illinois Franchise Disclosure Act ("IFDA"), 815 Ill. Comp. Stat. §§ 705/1-705/44. Section 26 of the IFDA authorizes private civil actions for damages based upon violations of the Act. 815 Ill. Comp. Stat. § 705/26 (West 2002).

The parties' briefs do not address the applicability of the IFDA to the franchise agreement at issue, even though the agreement provides that it is to be governed by Minnesota law. (Counterpl.'s Ex. A-6, at IL29.) The Court recognizes, however, that Section 41 of the IFDA contains an explicit "anti-waiver" provision that "represents a fundamental policy which invalidates contractual choice of law in the franchise context" in order to further the IFDA's purpose, which is to protect Illinois residents from making franchise investments without having necessary information. *Hengel, Inc. v. Hot 'N Now, Inc.*, 825 F. Supp. 1311, 1316-17 (N.D. Ill. 1993); *Salkeld v. V.R. Bus. Brokers*, 548 N.E.2d 1151, 1157 (Ill. App. 1989); *see* 815 Ill. Comp. Stat. § 705/41 (West 2002) ("Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act or any other law of this State is void."). Thus, the IFDA applies to the franchise agreement despite its choice of law provision.

8

1. <u>Sections 5(2) and 11</u>

The McKays argue that Miyamoto violated sections 5(2) and 11 of the IFDA by failing to provide the McKays with FOC No. 2 at least ten days before the parties executed the franchise agreement. Under section 5(2) of the IFDA, "[i]t is unlawful for any person to offer or sell any franchise which is required to be registered under this Act without first providing to the prospective franchisee at least 14[4] business days prior to the execution of by the franchisee of any binding franchise or other agreement . . . ." 815 Ill. Comp. Stat. § 705/5 (West 2002). Section 11 of the IFDA extends section 5(2)'s disclosure requirement to amendments:

> Within 90 days of the occurrence of any material change in any facts required to be disclosed, a franchisor whose franchise is registered under this Act shall amend its disclosure statement and shall deliver the amended disclosure statement in accordance with the requirements of subsection (2) of Section 5 . . . to any prospective franchisee, including prospective franchisees to whom a disclosure statement was previously delivered if the material change relates to or affects the franchisor or the franchise offered to such prospective franchisees.

*Id.* § 705/11.

The McKays were given FOC No. 1 on October 19, 1994 and the amended FOC No. 2 on April 11, 1995. They executed the franchise agreement on April 18, 1995. The McKays argue that Miyamoto violated Section 11 of the IFDA by delivering FOC No. 2, which contained "drastically modified investment and earnings projections," less than ten days before the sale of the franchise.

Miyamoto responds with an affidavit from Charles Modell, an attorney who is familiar with the franchise disclosure law of Illinois. (Modell Aff. ¶2.) In his affidavit, Modell states that the

---

[4]According to the counterplaintiffs, the statute had a 10-day requirement at the time they entered into the franchise agreement. The difference, however, is irrelevant to the analysis.

guidelines governing franchise disclosure documents were changed, and that franchisors were required to modify their disclosure documents by 1995. (*Id.* ¶3.) The new reporting requirements amended the matters that needed to be disclosed, and one of the changes concerned the initial investment disclosure. Under the new rules, the disclosure was changed to include operating costs during the initial phase, which was defined as a period of at least three months; the old disclosure did not include any operating costs. (*Id.* ¶¶3-4.) Therefore, according to Mr. Modell, the disclosure under the new guidelines showed an increase in the amount of the initial investment in 1995, but the actual initial investment was the same in 1994 and 1995.[5] (*Id.* ¶4.)

The McKays have proven that they received the amended disclosure statement, FOC No. 2, less than ten days before the sale of the franchise. They have not shown, however, that the amendments in FOC No. 2 were the result of "the occurrence of any material change in any facts required to be disclosed." Miyamoto has offered an unrebutted affidavit that the amendment was not the result of a material change in facts but rather a change in the method of reporting the facts. Therefore, the McKays have not shown there is no disputed issue of material fact regarding this issue, and their motion for summary judgment is denied as to sections 5(2) and 11 of the IFDA.

    2.    <u>Section 6</u>

The McKays claim that Miyamoto violated section 6 of the IFDA by providing false information with respect to the franchise sale. Section 6 of the IFDA provides that:

---

[5]The McKays' reply states that Mr. Modell's affidavit does not explain the differences between FOC No. 2 and a third FOC. (Counterpl.'s Reply Br. at 7.) The McKays do not discuss this alleged discrepancy, and there is no other evidence of a third FOC in the record. Indeed, the McKays' Statement of Uncontested Facts states that "[a]t no time after April 18, 1995 did the McKays receive any updated FOCs from Bixby's." (St. Facts ¶33.) Accordingly, the Court will not address this allegation.

> [i]n connection with the offer or sale of any franchise made in this State, it is unlawful for any person, directly or indirectly, to: (a) employ any device, scheme or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (b) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

815 Ill. Comp. Stat. § 705/6 (West 2002).

The McKays list several untrue statements of material fact made by Miyamoto during the process of the franchise sale: (1) Miyamoto backdated the franchise agreement; (2) he knew the investment figures in FOC No. 1 were false and that FOC No. 2 was being prepared with modified figures, but he assured the McKays that the FOCs were accurate and that the McKays' investment costs were normal; and (3) he had no reasonable basis for his assertions that the McKays' sales would be adequate to cover their costs, that FOC No. 1's revenue figures were conservative, and that Bixby's franchises would have over $1 million in annual revenues. The McKays claim that they relied on these knowing representations when they executed the development agreement, the franchise agreement, and the lease.

In addition, the McKays claim that Miyamoto violated section 6 when he represented at the franchisees' April 11, 1995 meeting that Bixby's had 340 executed development agreements, and that he repeated the misrepresentation in writing in May 1995 in the company's newsletter. The McKays relied on these representations when they executed their franchise agreement in April 1995 and when they executed their lease on May 8, 1995.

To be actionable under the IFDA, the misrepresentation must be "an untrue statement of a material fact." *Id.* "A material fact is one in which 'a buyer would have acted differently knowing

11

the information, or . . . concerns the type of information upon which a buyer would be expected to rely in making a decision whether to purchase.' . . . In other words, the fact 'must be essential to the transaction between the parties.'" *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001) (citations omitted).

A statement expressing an opinion or that relates to future or contingent events rather than to present facts, however, "'ordinarily does not constitute an actionable misrepresentation' under Illinois law." *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1298-99 (7th Cir. 1993) (citation omitted). For example, predictions of future sales or profitability are not considered representations of preexisting material facts. *See Barrington Press, Inc. v. Morey*, 752 F.2d 307, 310 n.1 (7th Cir. 1985)

The McKays have not shown that, contrary to the general rule, Miyamoto's statements about future events, costs, and profitability are actionable misrepresentations under the IFDA, so summary judgment cannot be granted based upon those statements. Moreover, the McKays do not offer any legal argument to prove their claim that the backdating of the franchise agreement constituted a deceptive act, considering that they acknowledge they were aware of the backdating at the time it occurred, and that they have not proven that Miyamoto's assurance that backdating the agreement would save the McKays money was a false representation.

The McKays have, however, conclusively shown that in April 1995, Miyamoto falsely claimed that Bixby's had 340 signed and paid-for development agreements when no more than fifteen development agreements had in fact been executed. Miyamoto's untrue statement was material to the McKays' decision to execute the Bixby's franchise agreement a week later. The McKays have demonstrated that there is no genuine dispute that Miyamoto made an untrue statement

12

of a material fact in connection with the offer or sale of any franchise made in this State, and therefore summary judgment should be granted as to the McKays' claim under section 6 of the IFDA.

### 3. Section 26

The McKays' final basis for liability under the IFDA is under section 26, which provides:

> Every person who directly or indirectly controls a person liable under this Section 26, . . . every principal executive officer or director of a corporation so liable, . . . who materially aids in the act or transaction constituting the violation, is also liable jointly and severally with and to the same extent as such person, unless said person who otherwise is liable had no knowledge or reasonable basis to have knowledge of the facts, acts or transactions constituting the alleged violation.

815 Ill. Comp. Stat. §705/26 (West 2002).

The McKays argue that Miyamoto, who was an officer and director of Bixby's, should be liable under section 26 as a result of the default order previously entered against Bixby's. The undisputed facts demonstrate that Miyamoto was principal executive officer and a director of Bixby's. Miyamoto has admitted that he materially aided in the transactions for which Bixby's admitted liability by default. Miyamoto has offered no evidence that he lacked knowledge of the facts constituting the violation; on the contrary, Miyamoto has admitted he knew he made untrue statements to the McKays. Therefore, summary judgment against Miyamoto is proper as to section 26 of the IFDA.

### B. Minnesota Franchise Act

Count II of the counterclaim contends that Miyamoto's actions violated Sections 80C.06, 80C.07, 80C.13, and 80C.17 of the Minnesota Franchise Act, Minn. Stat. Ann. §§ 80C.01-80C.22. Those sections are substantially the same as the IFDA sections discussed above, except that the

mandatory waiting period in Minnesota is seven days, not ten days as is required in Illinois. The McKays concede that Miyamoto did not violate the waiting period provision in Minnesota, but they claim that he violated the remaining sections of the Minnesota statute in the same manner as he violated the IFDA.

This Court need not decide whether or not Miyamoto's actions would have violated the Minnesota Franchise Act, because the McKays have not identified any reason that the Minnesota Franchise Act applies to this case. First, the Franchise Agreement states that "if the Franchisee is not a resident of Minnesota, and if the Franchised Store is not located in Minnesota, then [the parties] hereby waive the provisions of the Minnesota Franchise Act." (Franchise Agreement at 29.) Like the IFDA, the Minnesota Franchise Act contains an anti-waiver section, which provides that:

> Any condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise is a resident of this state, . . . or purporting to bind a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.

Minn. Stat. Ann. § 80C.21 (West 2001).

The McKays have not proven or even alleged that they were or are residents of Minnesota or that their franchise was to be operated in Minnesota. Therefore, they have not shown that the waiver contained in the Franchise Agreement was void or otherwise unenforceable in this case.

Second, even if the McKays had not waived application of the Minnesota Franchise Act, they have not shown that the Act's provisions would apply to the contract in the first place. The Minnesota Franchise Act's registration requirements, which the McKays claim that Miyamoto violated, apply to a person who offers or sells "any franchise in this state." *Id.* § 80C.02. The

14

McKays allege no facts demonstrating that the franchise at issue here was offered or sold in Minnesota. During the relevant time period, the McKays lived in Illinois, and the franchise was opened in Illinois. The only other state the McKays mention in their Statement of Uncontested Facts is Iowa, where the McKays went on a couple of occasions to meet with Miyamoto and to attend a franchisee reception. No facts in the record demonstrate that the Minnesota Franchise Act is applicable to the contract at issue, and even if it is, there is evidence in the record that the Franchise Agreement contained a valid waiver of its provisions. Accordingly, the McKays have not shown that they are entitled to summary judgment as to Count II.

**D.    Illinois Consumer Fraud and Deceptive Business Practices Act**

Count IV of the counterclaim is based upon alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"). The Consumer Fraud Act provides that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. Comp. Stat. § 505/2 (West 2002).

A plaintiff claiming a violation of the Consumer Fraud Act need not establish all the elements of common law fraud. *Salkeld*, 548 N.E.2d at 1160. The plaintiff must only show that: (1) the defendant engaged in a deceptive act or practice; (2) the defendant intended the plaintiff to rely

on the deception; (3) the deception occurred in the course of conduct involving trade and commerce; and (4) the deceptive conduct proximately caused the plaintiff's injury. *Cozzi*, 250 F.3d at 575-76.

The plaintiff does not need to prove actual or reasonable reliance on the deceptive representation to state a claim under the Consumer Fraud Act. *See id.* at 576; *Hengel*, 825 F. Supp. at 1322; *Siegel v. Levy Org. Dev. Co., Inc.*, 607 N.E.2d 194, 198 (Ill. 1992); *Salkeld*, 548 N.E.2d at 1160.

The McKays claim that a number of deceptive acts or practices occurred during the negotiation and execution of the franchise agreement: FOC No. 1's earnings and investment figures were false; Miyamoto reassured the McKays that the FOC No. 1 figures were conservative; Miyamoto represented at the April 11, 1995 meeting that Bixby's had executed 340 development agreements; Miyamoto repeated in the company newsletter in May 1995 that Bixby's had 340 development agreements; and Miyamoto backdated the McKays' franchise agreement and told them it would save them money. The McKays further allege that they were damaged as a result of the false statements.

The McKays are consumers for the purposes of the Consumer Fraud Act, and their purchase of a franchise was done in the course of commerce. *See Bixby's Food Sys., Inc. v. McKay*, 985 F. Supp. 802, 807 (N.D. Ill. 1997). The facts in the record show that Miyamoto made certain misrepresentations during his negotiations with the McKays. As discussed above, the McKays have not shown conclusively that misrepresentations relating to future events are actionable or that Miyamoto's act of backdating the franchise agreement was deceptive.

There is no genuine dispute, however, that Miyamoto did make a false statement of a present material fact when he claimed in April 1995 that Bixby's had 340 executed development agreements

and that they were damaged as a result. The McKays have therefore sustained their burden of proving summary judgment should be granted as to Count IV.

### E.     Common Law Fraud

Count V of the counterclaim alleges common law fraud. Common law fraud is more difficult to prove than a claim under the Consumer Fraud Act, because the plaintiff must also prove actual and reasonable reliance on the representations. *See Salkeld*, 548 N.E.2d at 1160. The elements of a common law fraud claim are: "(1) that the defendant made a statement; (2) of a material nature as opposed to an opinion; (3) that was untrue; (4) that was known or believed by the person making the statement to be untrue, or made in culpable ignorance of its truth or falsity; (5) that the victim relied upon to his detriment; (6) that the statement was made for the purpose of inducing reliance; and (7) that the victim's reliance led to his injury." *Id.* at 1157. In Illinois, fraud must be shown by clear and convincing evidence. *Stromberger v. 3M Co.*, 990 F.2d 974, 978 (7th Cir. 1993); *Hofmann v. Hofmann*, 446 N.E.2d 499, 506 (Ill. 1983).

The general rule in Illinois is that any statements regarding future events, circumstances, profitability, and financial success cannot be a basis for a fraud claim. *See Barille v. Sears Roebuck & Co.*, 682 N.E.2d 118, 123 (Ill. App. 1997); *Barrington Press*, 752 F.2d at 310 n.1; *see also Hengel*, 825 F. Supp. at 1320-21 ("The court rejects plaintiff's assertion that the projected financial statements can support a claim for fraud.").

An exception to the general rule exists "[w]here the misrepresentation is alleged to be the mechanism by which the party making that representation intended to defraud." *Barille*, 682 N.E.2d at 123; *see Carroll v. First Nat'l Bank of Lincolnwood*, 413 F.2d 353, 358 (7th Cir. 1969). The exception, however, only applies to fraud based on promises of future conduct, not based on

17

opinions about future events. *See Barrington Press*, 752 F.2d at 310 n.1 (distinguishing cases in which the exception applied, because "those cases involved promises of future *conduct* by the seller, whereas here the misrepresentation regards the seller's projections or *opinion* as to the business's future sales and profitability, something the seller had no control over after selling the business") (emphasis in original).

A party claiming common law fraud must also prove that he justifiably relied on the statements made by the defendant. *See Soules v. General Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980); *Barille*, 682 N.E.2d at 123. "The question is whether, under all the circumstances, plaintiff had a right to rely on the false representations. This question is to be answered while viewing the representation in light of all the facts of which plaintiff had actual knowledge as well as those of which he 'might have availed himself by the exercise of ordinary prudence.'" *Soules*, 402 N.E.2d at 601; *accord Cozzi*, 250 F.3d at 574; *Barille*, 682 N.E.2d at 123.

Courts differ on whether, or under what circumstances, the existence of an unambiguous merger and integration clause in an agreement makes reliance on oral representations not contained in the written agreement unreasonable. Some cases hold that a plaintiff cannot reasonably rely on oral representations inconsistent with or not included in a written agreement that contains a merger clause. Others hold that in certain circumstances, a party may reasonably rely on representations not contained in the agreement even when the agreement contains a merger clause. *Compare Cozzi*, 250 F.3d at 575; *Worldcom Network Servs., Inc. v. UMG Communications Groups, Inc.*, No. 97 C 5867, 1998 WL 341830, at * 5 (N.D. Ill. June 4, 1998); *Barille*, 682 N.E.2d at 123; *with Arlington Fin. Corp. v. Ben Franklin Bank*, No. 98 C 7068, 1999 WL 286080, at *5 & n.5 (N.D. Ill. Apr. 29, 1999);

*West Coast Video Enters., Inc. v. Ponce de Leon*, No. 90 C 1236, 1991 WL 49566, at *5 (N.D. Ill. Apr. 4, 1991); *Salkeld*, 548 N.E.2d at 1157-58.

The McKays have the burden of proving each element of a claim for common law fraud by clear and convincing evidence. The McKays state that every element of common law fraud except for reasonable reliance was previously addressed in its arguments for summary judgment on their other counterclaims and list no specific representations for which Miyamoto is liable for common law fraud. In support of their claim of reasonable reliance, the McKays state that "the record reflects that the McKays considered numerous other investment possibilities outside of Bixby's, but that they relied on Miyamoto's representations and promises because neither of them had prior experience in the restaurant business." (Counterpl.'s Mot. for Summ. J., at 9-10.)

The Court has already found that Miyamoto's April 1995 statement that Bixby's had 340 signed development agreements is the only statement that the McKays have proven is a knowingly false statement of a present material fact. The McKays have also shown that they actually relied on Miyamoto's false statement. The McKays are not entitled to summary judgment, however, because they have failed to show by clear and convincing evidence that their reliance was reasonable.

First, their argument in support of reasonable reliance is unclear and does not demonstrate the absence of any genuine issue of material fact. Second, the franchise agreement at issue in this case contains a merger and integration clause purporting to disclaim any understandings or agreements between the parties not contained in the written agreement. (Counterpl.'s Ex. A-6, at IL29-IL30.) The McKays do not show, through facts or case law, that they reasonably relied on Miyamoto's oral representations despite the existence of the merger clause; indeed, they do not address the issue of the merger clause at all. The McKays have not met their burden of proving that

19

they reasonably relied on Miyamoto's representations. As a result, summary judgment is not justified as to Count V of the counterclaim.

The Court emphasizes that as the movants, the McKays had the burden to prove both that there are no disputed issues of material fact and that the undisputed facts in the record warrant a finding of summary judgment. The Court's finding that the McKays have not met their burden for certain claims should not be interpreted to reflect one way or the other whether the McKays will be able to prove their case at trial.

## IV. **CONCLUSION**

For the reasons stated above, Counterplaintiffs' Motion for Summary Judgment against Counterdefendant Ken Miyamoto is GRANTED as to Count I (Illinois Franchise Disclosure Act) and Count IV (Illinois Consumer Fraud and Deceptive Business Practices Act), and DENIED as to Count II (Minnesota Franchise Act) and Count V (common law fraud). The matter is set for status on April 24, 2002, at 10:30 a.m. Miyamoto is directed to contact the Court if he wishes to participate at the status by telephone.

**E N T E R:**

*Nan R. Nolan*

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated:** 3/27/02